# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 17, 2003 Session

## STATE OF TENNESSEE v. PAUL GRAHAM

### Direct Appeal from the Circuit Court for Montgomery County
#### No. 40100270     Michael R. Jones, Judge

---

### No. M2003-00331-CCA-R3-CD - Filed April 7, 2004

---

The defendant was convicted by a jury of second degree murder of his wife. The defendant appeals his conviction and sentence and alleges the following errors: (1) the evidence was insufficient to support the conviction; (2) the admission of hearsay testimony and failure to give a curative instruction; (3) the admission of expert opinion that the death was a result of homicidal violence when cause was undetermined; (4) cumulative errors required a new trial; and (5) improper sentencing. After review, we conclude that there is no reversible error and affirm the conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Carrie W. Gasaway, Clarksville, Tennessee, for the appellant, Paul Graham.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Paul Graham, the defendant, was indicted concerning the death of his wife, Tammy Graham, in a three-count indictment: Count One, especially aggravated kidnapping; Count Two, aggravated kidnapping; and, Count Three, first degree murder. At the conclusion of the State's proof, the trial court granted the defendant's motion for judgment of acquittal as to Counts One and Two. The jury returned a conviction for second degree murder. At sentencing, the trial court imposed a sentence of twenty-three years, to be served 100% as a violent offender.

The defendant has timely filed an appeal of right and raised five issues:
(1) whether the evidence is sufficient to support the conviction;

(2) whether the trial court erred in admitting certain statements made by the victim and failed to give a curative instruction upon request;

(3) whether the trial court erred in allowing an expert to testify that the victim died of homicidal violence when the cause of death was undetermined;

(4) whether cumulative errors entitled the defendant to a new trial; and

(5) whether the trial court erred in sentencing.

### Facts

The victim, Tammy Graham, was married to the defendant, and they had two sons, ages two and seven, at the time of her death. The Grahams resided on Charley Sleigh Road in Clarksville. The victim was employed as a medical health technician at Tennessee Christian Medical Center.

Brenda Hull, the mother of the victim, stated that the victim was thirty-nine years old at her death. The victim was married first to Jimmy Rucker, and two children were born of that marriage. The victim had worked as a nurses aide. Ms. Hull last saw her daughter alive in May of 2000.

In June of 2000, Patty Hightower was the nurse manager who scheduled the victim's work hours. She said the victim had wanted to work as much overtime as possible. Ms. Hightower stated the victim had worked the 7:00 p.m. shift on Saturday night, June 24th. This shift ordinarily lasted until 7:00 a.m. on Sunday, but the victim had called Ms. Hightower at about 3:30 a.m. on June 25th, requesting to go home early because things were slow at work. Ms. Hightower gave permission and stated that after the patients went to bed at 10:00 p.m., that it was usually quiet unless there were admissions. The victim did not work the night of June 25th or the next night, according to Ms. Hightower. She said the defendant called at approximately 10:00 a.m. on June 26th and inquired if the victim had worked the night before.

Matthew O'Connor testified that in June of 2000, he was employed as a staff nurse at the same medical center as the victim. About one week before the victim's death, Mr. O'Connor assisted in transferring some china from one vehicle to another in a transaction involving the victim and a co-worker, Valerie Hines. At about 2:00 a.m. on June 25th, the victim asked his permission to go home early. Mr. O'Connor said no other permission than his was needed, and he granted the victim's request. Prior to leaving the building, the victim told him that she hoped she would not get shot going home at that hour. O'Connor then walked the victim to her car. The testimony of Mr. O'Connor was admitted over the defendant's prior objection.

Lester Bain, the Regional Security Manager for AmSouth Bank, testified concerning the security cameras at AmSouth Bank on Fort Campbell Boulevard in Clarksville. He explained that there are two cameras located at the drive-up automatic teller machine. One camera takes a picture of the person making the transaction, while another camera takes a picture of the rear of the vehicle in order to capture the license plate. The image alternates between the two cameras and videos a three-second interval on each. The tape is imprinted with a time and date. An ATM receipt which was issued contemporaneously with the image shown, bore a time of 8:15 a.m. on June 25th while

the image on the video showed a time of 7:02 a.m. The witness stated that the hour differential was due to the tellers' failure to reset for Daylight Savings Time. The thirteen-minute difference was attributed to the tellers' using their own watches to set the time data. Still photographs of the transaction timed at 7:02 a.m. on June 25th were introduced during Mr. Bain's testimony.

James Rucker testified that he was formerly married to the victim, and that union produced two children who resided with him in Pembroke, Kentucky. Mr. Rucker stated that the victim had made arrangements to pick up their daughter, Sarah, at 8:00 or 9:00 a.m. on June 25th, for a visitation of several days. On cross-examination, he admitted that he may have made a statement earlier that the victim's appointed pick-up of Sarah was 2:00 p.m. on June 25th. In either event, the victim did not keep the appointment.

Coleen Moore lived "across the street and three houses down" from the Grahams on Charley Sleigh Road. She testified she was a good friend of the victim and had known the Grahams for five years. She stated that the victim was planning to obtain a divorce from the defendant and was working extra hours and trying to sell personal items to obtain funds to hire a lawyer. Ms. Moore believed the victim needed $500 to hire a lawyer and had offered to give the victim that amount on more than one occasion. The victim had asked Ms. Moore once to keep money for her, but never brought it to her. Over the defendant's objection, Ms. Moore said the victim had expressed a fear that the defendant would find the money she was saving for the divorce. Ms. Moore was familiar with the vehicles driven by the Grahams and stated the victim drove a silver Oldsmobile and the defendant drove an "older, dark Army kind of green truck." On June 25th, she stated that both vehicles were present at the Graham's residence at about 7:45 a.m. Periodically during the day, she looked again and did not see either vehicle.

On June 26th, Ms. Moore called for the victim and spoke with the defendant who stated the victim was not at home and may have been called in to work. The defendant also volunteered that he and the victim had argued that morning about their youngest child not being placed in his car seat by the defendant. Ms. Moore called the defendant again approximately an hour and a-half later to inquire of the victim. The defendant again brought up the argument concerning the car seat and told Ms. Moore that after the argument, he and the victim had taken a nap and that she was gone when he awoke. Later, at approximately 11:00 a.m., Ms. Moore called the defendant again, and he did not know the victim's whereabouts. Ms. Moore told the defendant to call the police or she would call. Later in the day, she saw the defendant with his two sons in the truck. He stopped and told her he was nervous and was going to his family's house.

Kathy Pine was a neighbor of the Grahams who had worked with the victim at several jobs, including their current employer, Tennessee Christian Medical Center. She related that the victim was trying to save money to obtain a divorce. She said the victim worked as much as possible and spoke of selling her china and silver. Ms. Pine left to go to Birmingham on June 25th and said she saw the Graham's vehicles at their home at approximately 7:45 a.m. On her return about 6:00 p.m., neither of the Graham vehicles were present. On June 26th, Ms. Pine's caller ID reflected a call from the Graham residence at about 10:00 a.m. Ms. Pine called the number and spoke with the defendant.

He asked Ms. Pine to call the workplace and see if the victim had worked the night before. Ms. Pine did call and learned that the victim had not worked. She did not call the defendant back.

Norma Green served as the records clerk for the Montgomery County Sheriff's Department. On June 26, 2000, at 11:54 a.m., she received a missing person report from the defendant concerning the victim. The defendant furnished a description of the victim and her automobile and told Ms. Green that the Grahams were going through a divorce. The defendant also told her that the victim should have $40 on her person.

Corporal Jessie Nugent of the Montgomery County Sheriff's Department, was working the midnight shift on June 28, 2000, and was specifically searching for the victim's vehicle. In the process of going through the parking lots on Fort Campbell Boulevard, Corporal Nugent saw the victim's automobile at Marshall's Hair Care at about 4:30 a.m. He secured the area around the victim's vehicle and took Polaroid photographs of the scene and vehicle interior, but did not enter the vehicle. The victim's body was observed in the backseat floorboard with a child's car seat on top of her body.

Detective Sergeant Brian Prentice of the Montgomery County Sheriff's Department received notice of Corporal Nugent's discovery and went to the scene. He stated that Marshall's Hair Care is located directly across from Wal-Mart on Fort Campbell Boulevard, and the victim's vehicle was parked within a foot or two of a blank wall of the Marshall's building. The lot in which the vehicle was found is on the opposite side of the building entrance. The car was approximately fifty feet from Fort Campbell Boulevard. The victim's body was lying face down in the backseat floorboard with a child car seat on top of her. Sergeant Prentice said that a purse was overturned in the front floorboard, and its contents, including keys, wallet, identification cards, receipts, sunglasses, and other items, were dumped out. No money was found. Although numerous ATM receipts were found, there was no ATM card found. He stated the weather had been very hot, and the body had decomposed, causing moisture to collect in the car interior. These conditions precluded the officers' ability to take fingerprints.

Sergeant Prentice interviewed the defendant on June 27th at the defendant's home, in regard to the missing person report. During the interview, he noticed a large cut on the defendant's left index finger. He also related that the defendant's phone was ringing, but the defendant declined to answer, saying it was telemarketers calling.

Sergeant Prentice had viewed the video provided by the security cameras at AmSouth Bank. He stated that it showed the victim driving , then the defendant got out from the backseat passenger side and took the steering wheel position, while the victim got in the backseat on the passenger side that the defendant had vacated. There were two children in the car that he could not identify.

On cross-examination, Sergeant Prentice stated that the defendant informed him on June 26th, of the Grahams having been to the ATM machine on June 25th. He also said that a search of

the Grahams' backyard and woods was conducted the day the body was discovered, and no evidence was found.

Wanda Smith drove past Marshall's Hair Care on June 25th between 9:05 to 9:15 a.m. She saw a gray Oldsmobile parked on the north side of the building on the opposite side of the building entrance. She identified a picture of the victim's car as the one she had seen. On cross-examination, she denied seeing any activity or persons at the surrounding businesses.

Judy Goble was passing Marshall's Hair Care at approximately 10:55 to 11:00 a.m. on June 25, 2000. She noticed a light-colored car parked on the north side of Marshall's, very close to the building. She also identified a photograph of the victim's car as the one she had seen on the morning of June 25th. She saw no other activity in the area that caught her attention.

Gary Hodges was a criminal investigator for the Clarksville Police Department and performed a search of the victim's vehicle after its removal to an impound lot. He stated he found an ATM receipt in the front floorboard for a withdrawal of $20. The receipt was dated June 25, 2000, at 8:15 a.m. No money was found in the vehicle.

Dr. William Morris, a dentist who had treated the victim, testified in order to identify and introduce the victim's dental x-rays. He had previously made the x-rays available to police investigators.

Dr. Bruce Levy, a forensic pathologist, testified concerning the autopsy he had performed on the victim. The dental records provided by Dr. Morris were a positive match with the victim and established the badly decomposed body to be Tammy Graham's. The autopsy was performed on June 29, 2000, and Dr. Levy stated the victim's body was "in an advanced state of decomposition." He said that by a "rough estimate[ ]" she had been dead two or three days. She was clothed in only a pair of panties which were pulled up on her right leg, but not the left.

X-rays of the victim revealed no fractures or foreign materials in the body. An external examination revealed four bruises on her neck, but no other visible injuries. The decomposition hampered a full evaluation, but Dr. Levy was able to rule out any penetrating injury or skeletal injury, leading him to conclude there was an absence of blunt force injury.

Dr. Levy did a complete internal examination which failed to reveal any significant natural disease or internal injury. A toxicology screen was negative for drugs and alcohol, and her carbon monoxide levels were "shown to be normal." Dr. Levy elaborated that the carbon monoxide level was normal for smokers, and two tests showed a level of seven and thirteen percent respectively. He stated this level is consistent with a smoker or a person exposed to an environment where cigarettes are smoked.

Based on these factors, Dr. Levy opined that the cause of death was "homicidal violence of an undetermined type . . . most likely, she died as a result of some type of asphyxiation." He stated

that though he was unable to conclusively prove death by asphyxiation, it was his belief "because that's all that is left after you rule out all the other possible causes of homicide." Dr. Levy stated that the condition of the body was consistent with her death occurring on Sunday, June 25, 2000, due to the day of refrigeration at the laboratory which delayed further decomposition.

On cross-examination, Dr. Levy admitted that he could not state with any reasonable degree of medical certainty exactly what had happened. He agreed that the neck bruises were superficial, and there were no internal neck injuries.

Patricia Claxton, a certified nurse assistant, had worked with the victim from 1994 to 1996. On the first day she met the victim in November of 1994, she stated that they immediately developed a relationship. Over the defendant's prior objection, Ms. Claxton said the victim had told her that day that should anything happen to her, Ms. Claxton should contact the police because the defendant had threatened her. Based on "a couple of" encounters at the grocery store, Ms. Claxton said the victim seemed "reserved, withdrawn, kind of quiet" around her husband, the defendant. Otherwise, she characterized the victim as "happy, smiling and joking" when not with the defendant.

Elizabeth Wells was a registered nurse who, on one occasion, had worked at a facility with both the victim and the defendant. Ms. Wells said that the defendant would come to work when he was not scheduled "to check on Tammy." The defendant asked for a curative instruction to disregard this testimony, which was denied. The witness and victim were working at the same facility prior to the victim's death. She stated the victim was working as much overtime as she could to obtain funds for a divorce. Less than two weeks prior to the victim's disappearance, she told Ms. Wells she had found a lawyer for the divorce. During cross-examination, Ms. Wells said that it was necessary for the defendant to come to the facility where he had worked with her and the victim, in order to leave paperwork.

Timothy Horton, a physical therapist, had also worked with the defendant and victim at the same facility between 1996 and 1998. He said the defendant would come by work on his time off. The defendant also called the workplace and inquired as to the location of the victim. Mr. Horton admitted on cross-examination that the defendant came by on occasions to leave paperwork connected with his employment.

Valerie Hines worked the same shift as the victim in the winter and spring of 2000. She said the victim was working as many twelve-hour shifts as she could, in order to fund a divorce. Ms. Hines stated she had bought a set of china from the victim on June 23rd or 24th of 2000, and paid $200 in cash. A co-worker named Matt transferred the china from the victim's vehicle to Ms. Hines' vehicle. On Monday, June 26, 2000, Ms. Hines spoke with the defendant on the telephone. He had called work and asked to speak with Patty Hightower.

Theresa Green was a co-worker of the victim's in the months preceding the victim's death. The victim had discussed her anticipated divorce and seemed "really happy" over the belief that the defendant was to leave their house.

Douglas Neely, a deputy with the Montgomery County Sheriff's Department, had driven three different routes from the Graham residence to Marshall's Hair Care. He stated the distance varied from ten to eleven miles and times varied from thirteen to sixteen minutes.

Pamela Clark worked as a human resources administrative assistant at Bridgestone Metalpha, the defendant's employer. She stated the defendant began his employment on May 3, 1999. At that time he declined life insurance and accidental death and dismemberment for his family. During an open enrollment period in December of 1999, the defendant accepted accidental death and dismemberment for himself, the victim, and their two children. The policy was for $250,000 and death benefit for a non-employed spouse would pay forty percent of that amount. On cross-examination, the witness stated the defendant had named the victim as beneficiary for his life insurance policy.

Ginger Hickson worked as a security guard at the victim's place of employment. Ms. Hickson was in the process of obtaining a divorce and had discussed mutual plans with the victim. The victim believed the defendant would be leaving their residence at the end of June, and it was planned for Ms. Hickson and her child to move in with the victim.

Andrea Rawlings was an attorney in Montgomery County who practiced primarily in the field of family law. She had met with the victim on one occasion and quoted two separate fee requirements, depending on the work to be done. The down payments on each option, including filing costs, were $325 and $375 respectively. The victim's next appointment was scheduled for July 5, 2000.

At the conclusion of the State's proof, the defendant's motion for judgment of acquittal was granted as to the counts of especially aggravated kidnapping and aggravated kidnapping, leaving only the third count of first degree murder.

Robert Phillips was the first witness called by the defendant. On June 25, 2000, Mr. Phillips had mowed the grass for a realtor in the area around Marshall's Hair Care, where the victim was found in her car. He was at this area from approximately 9:45 a.m. to 2:30 p.m. On direct, he stated he had not seen the victim's car at Marshall's on that date but, on cross-examination, he conceded he could not be sure whether the car was present.

Lawrence Shaffer had lived as a next-door neighbor to the Grahams until June 25, 2000, when he moved away. On that morning, Mr. Shaffer was tearing down a dog pen when the defendant visited with him between 10:00 a.m. and 11:20 a.m.

Jennifer Smith also lived next door to the Grahams and, until June 25, 2000, Lawrence Shaffer had lived with her and her husband. She recalled watching Shaffer remove the dog pen structure and saw the defendant having a conversation with Shaffer. Her recollection was that this occurred between 9:00 and 10:00 a.m. on June 25, 2000.

Ronald Hardy lived two doors away from the Graham residence in June of 2000. He recalled seeing Mr. Shaffer tearing down the dog pen on June 25, 2000, and also saw the defendant in his backyard while the defendant's two sons played on the swing set.

Donald Roush lived across the street from the Grahams on June 25, 2000. He recalled going across the street that morning to talk with Mr. Shaffer. He recalled seeing the defendant with his two sons in their yard at approximately 10:00 a.m. He also stated that both of the Graham vehicles were parked in their driveway at the time. On cross-examination, Mr. Roush admitted he had not consulted a watch to pinpoint the time of his visit with Mr. Shaffer. He admitted being a friend of the defendant, but denied that he was lying to help the defendant.

Kevin Graham, the defendant's brother, testified that he saw the defendant and his two children in Hopkinsville, Kentucky at approximately 12:30 p.m. on June 25, 2000. He stated he had known the victim for approximately ten years and knew she was a non-smoker.

Kim Graham, wife of Kevin Graham, stated she had seen the defendant at her mother-in-law's in Hopkinsville on June 25, 2000. During the afternoon, the defendant and her husband left for about an hour. The defendant's children played in a normal fashion with the other children who were present. She also stated that the victim was not a smoker.

George Haddock, the father of Kim Graham, stated he was visited on June 25, 2000, by Kevin Graham and the defendant. Mr. Haddock is a mechanic, and the Graham brothers asked him to check a noise in the defendant's truck engine. The visit occurred about 1:30 p.m.

Ernie Rice, a private investigator, had videotaped two routes from Marshall's Hair Care to the Graham residence. One route was 9.7 miles in length and took 15 minutes, 35 seconds in travel time. The second route was 10.9 miles in length and was 16 minutes, 25 seconds in duration.

Dr. Charles Harlan, a forensic pathologist, had reviewed the autopsy report prepared by Dr. Levy. Dr. Harlan agreed that the cause of death could not be determined. In regard to carbon monoxide levels, he said the standard fatal level is forty percent; much higher than that found in the victim's system. He stated that for a non-smoker to have a level of seven to thirteen percent, they would have to be exposed to a source of carbon monoxide such as a room with a large number of smokers or exposure to engine exhaust. He said that while the level of the victim's carbon monoxide was significant, it was not the cause of death.

## Analysis

### Sufficiency

The defendant maintains that the evidence, viewed in the light most favorable to the State, is insufficient to support a conviction for second degree murder. The State contends that the

evidence, even though circumstantial, points unerringly at the defendant and fully supports the conviction.

The standard of review of a grant or denial of a motion for judgment of acquittal is, in essence, the same which applies in determining the sufficiency of the evidence after a conviction. See State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). That well-established standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). In conducting the review, we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Although the defendant rightfully contends that there is no direct evidence of the defendant's guilt, it has long been recognized that circumstantial evidence may be used exclusively to establish guilt. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999), appeal denied (Tenn. 2000). The weight of the circumstantial evidence is for the jury to determine. See Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1977).

The evidence herein established that the victim was diligently working toward the goal of a divorce by working extra hours and selling personal items to amass funds to finance her divorce fees. The victim believed the defendant was soon to remove himself from their residence and was happy at the prospect. She had contacted a divorce lawyer and had another appointment with the lawyer on July 5, 2000. On the morning of June 25, 2000, the victim was captured on AmSouth Bank's video at approximately 8:15 in the company of her husband and their two small children. Coleen Moore, a neighbor and a friend of the victim, had several conversations with the defendant on June 26th. The defendant told Moore that on Sunday morning, June 25th, he and the victim had argued over the car seat being used for their youngest child. The defendant also told her that after the argument, the family had taken a nap and when he awoke the victim was gone. By necessity this would have had to occur after the trip to the ATM machine. Assuming the jury accredited the testimony of Wanda Smith, that she saw the victim's vehicle at Marshall's Hair Care between 9:05 a.m. to 9:15 a.m. on June 25th, the defendant is faced with a very compacted time line. The video camera at AmSouth Bank on Fort Campbell Boulevard showed the defendant and the victim both present at approximately 8:15 a.m. on June 25th. Acceptance of an approximate one-hour time span for the parties to return home, argue, and nap would narrow considerably the opportunity of any other potential perpetrator.

The State's brief asserts that the defendant stated that the Grahams bought doughnuts after the stop at the ATM and that the victim consumed one or more doughnuts. The State contrasts this with Dr. Levy's testimony that the victim had not eaten within twelve hours of her death. The only reference to the record cited by the State, and the only reference found in our review, as to the

purchase of doughnuts was contained in a pretrial order prepared by the trial court. Accordingly, we did not consider this statement by the defendant as evidence.

There was also evidence that the defendant stood to benefit from a life insurance policy in effect at his employment on the victim's life.

Due to the extent of the decomposition of the victim's body, Dr. Levy, the forensic pathologist, could not determine the precise cause of death. By the elimination of natural causes, internal injuries, accidental death, or suicide, the pathologist was led to the hypothesis that the victim died from homicidal violence of an undetermined nature, but most probably from a form of asphyxiation. The victim's neck bore superficial bruises consistent with some form of strangulation.

The victim was found in the floorboard of her vehicle's back seat, wearing panties pulled up on the right leg only. A child's car seat had been placed on top of the victim's body. It was clear from the expert evidence that the victim did not die from natural causes.

The defendant had motive and opportunity. The fact finder in this cause was entitled to rationally conclude that the defendant's guilt was established beyond a reasonable doubt. We conclude the evidence was sufficient to support the jury's finding of guilt.

### Hearsay/Evidentiary Issues

The defendant next contends that certain statements made by the victim to various witnesses should have been excluded as inadmissible hearsay. The State contends that the defendant waived the issue as to three of the statements by failure to enter a contemporaneous objection or that the statements were not hearsay and, if they were, then were admissible as an exception to show the victim's state of mind.

Preliminary to examination of each of the witnesses' statements, we note that each statement was hearsay. Hearsay is inadmissible unless it falls within an enumerated exception. See Tenn. R. Evid. 802 and 803. The State argues that the "state of mind" exception to the hearsay rule is applicable.

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed . . . .

Tenn. R. Evid. 803(3).

Applicable law provides that the statements must be relevant pursuant to Tenn. R. Evid. 401, 403 and cannot be used to prove conduct of a third party. Tenn. R. Evid. 803(3), Advisory Commission Comments. See also State v. Hutchinson, 898 S.W.2d 161, 171 (Tenn. 1994); State v. Farmer, 927 S.W.2d 582, 595 (Tenn. Crim. App. 1996). Our review also indicates that the defendant did not waive the subject testimony by failure to object.

-10-

Several witnesses were allowed to testify concerning the victim's statements to them about her plans for a divorce. Coleen Moore testified that the victim said she did not keep her money for the divorce at home for fear the defendant would find it. Teresa Green stated the victim expressed her happiness at the prospect of the defendant's departure from the residence. Ginger Hickson gave an account of her conversations with the victim about the victim's plans for divorce and sharing the Graham residence with Hickson. Kathy Pine and Elizabeth Wells also furnished testimony that the victim was taking material steps toward imminent divorce proceedings.

The State contends that these hearsay statements are admissible to show the victim's state of mind concerning her marriage as opposed to being probative of the defendant's conduct. However, the State's brief then asserts the theory at trial that the defendant was possessive and controlling and "was not going to allow Mrs. Graham to divorce him, even if it meant her death." This strongly indicates that the real purpose of these hearsay statements was to prove the defendant's conduct, an impermissible use.

In addition, we conclude that even if admissible to show the victim's state of mind, it would fail on relevance. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Statements made by a murder victim that expressed fear of the defendant were not directly probative of whether the defendant committed murder. State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993). A similar statement made by the victim of the defendant, "I'm afraid of her and don't know what she will do," was ruled as inadmissible hearsay and irrelevant in State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998). Likewise in this case, the victim's plans for divorce and her state of mind toward the defendant do not directly prove that the defendant committed murder. For the foregoing reasons, we conclude admission of these statements was error.

Patricia Claxton testified that in November of 1994, the victim told her to notify the police if anything ever happened to the victim and that the defendant had threatened her. It is apparent that this testimony was introduced to prove the conduct of the defendant, which we have previously acknowledged as impermissible under the exception provided by Tennessee Rule of Evidence 803(3). A statement by a murder victim expressing fear of the defendant is not directly probative that the defendant committed murder. Smith, 868 S.W.2d at 573; Leming, 3 S.W.3d at 18. As to the remoteness of the statement, this would go to the weight rather than its admissibility. Smith, 868 S.W.2d at 575. However, for the reasons stated, we conclude that admission of this statement was error.

Mark O'Connor testified that on the night before her disappearance, as she left for work, the victim said she hoped she would not be shot going home early on the morning of June 25, 2000. The statement is nebulous in its meaning and only assumes an ominous air in the aftermath of events. While the statement is indicative of a state of unease on behalf of the victim, it fails on relevance. The victim was not shot, and no evidence appears in the record concerning any firearm use or discovery of any firearm. We conclude this statement was also inadmissible.

-11-

Having determined that the testimony of the above named witnesses was admitted erroneously, we must now determine if the error was harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

The hearsay testimony referred to above concerning divorce merely supplemented other evidence in the record. The defendant, in his initial report to the Clarksville police, related to Norma Green, the police records' clerk, that the parties were divorcing. Also, the attorney consulted by the victim testified as to the victim's plans for divorce and that another appointment was scheduled on July 5th.

The evidence, although circumstantial, pointed unerringly at the defendant. The undisputed expert testimony established that the cause of death was not from natural causes, suicide, or accident. The nearly naked, decomposed corpse of the victim was found in her vehicle, under a child's car seat, the subject of a recent dispute between her and the defendant. Her vehicle was seen where it was later found by police, within approximately an hour of the victim's appearance on a video camera with the defendant. By the defendant's own admission, he, the victim, and their children had in the intervening hour returned to their home. There the defendant and the victim quarreled and then retired for a nap. The limitations of time are so circumscribed as to eliminate opportunity for any potential malefactor other than the defendant. In light of this and other evidence as contained in the record, we conclude that the error in allowing the subject testimony was harmless.

The defendant also objected to the testimony of Timothy Horton, who had worked with both the victim and defendant between 1996 and 1998. He testified that the defendant would come by work on his time off and also call and ask about the victim's whereabouts. The State's theory in establishing the defendant's motive was that the defendant was a very controlling person over his wife. This testimony was relevant to show indicia of such control and was properly admitted.

The defendant also alleges error for failure of the trial court to give a curative instruction after a witness, Elizabeth Wells, gave a conclusory opinion in answer to an innocuous question. This sequence of testimony was a follows:

Q: Was there ever a time when you and Tammy Graham and Paul Graham all worked for Columbia?
A: Yes.
Q: Do you have personal knowledge of any times Mr. Graham came by Columbia when he wasn't scheduled to work?
A: Yes.
Q: Do you know about how often that would happen?
A: No. Just that he would come by to check on Tammy to make sure . . . she was there.

Defense counsel promptly objected and requested a curative instruction to disregard the answer. The trial court declined to do so and suggested that the issue be dealt with on cross-

examination. The answer was non-responsive, conclusory, and based on speculation. Failure to give a curative instruction was error, and we must now determine if it was reversible error.

We have previously determined that the testimony of Timothy Horton of similar actions by the defendant was admissible. We consider Ms. Wells' testimony as cumulative to Mr. Horton's. The testimony at issue in the context of the entire trial was not so significant that we feel the failure to give a curative instruction more probably than not affected the judgment or resulted in prejudice to the judicial process. Tenn. R. App. P. 36(b). Neither do we find that the error affected the result of the trial on the merits. Tenn. R. Crim. P. 52(a). Accordingly, we conclude that this error was harmless.

## Expert Testimony

The defendant also contends that Dr. Levy's conclusion that the victim died as a result of "homicidal violence of an undetermined type" was error because he could not determine, with medical certainty, the actual cause of death. The trial court relied upon the authority of State v. Bragan, 920 S.W.2d 227, 245 (Tenn. Crim. App. 1995), in its decision to admit the testimony. In Bragan, this Court stated: "The cause of death and whether the death was a homicide are two different things. Even though a witness is unable to testify as to the exact cause of death, it does not necessarily follow that the witness cannot testify as to whether the death was a homicide." Although the defendant attempts to factually distinguish Bragan, we find it persuasive and conclude that this issue is without merit.

## Sentencing

The defendant next alleges that the trial court erred in sentencing. The trial court applied two enhancement factors: (1) the defendant had a history of criminal behavior, Tenn. Code Ann. § 40-35-114(16), and (2) the defendant abused a position of private trust, Tenn. Code Ann. § 40-35-114(2). One mitigating factor was considered: that the defendant had a good employment history, an absence of criminal convictions, and had provided family support. See Tenn. Code Ann. § 40-35-113(13).

When sentencing is challenged, our review is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210(b), to consider the following factors in sentencing:

(1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

At the time of this offense, the presumptive sentence for a Class A felony was at the midpoint within the range if there were no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c) (1998). When there are enhancement and mitigating factors present, the trial court should enhance the range for the enhancement factors and then reduce the sentence within the range for mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Madden, 99 S.W.3d 127, 138 (Tenn. Crim. App. 2002); see Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments.

The defendant asserts that the trial court erred in considering pretrial evidence, which was excluded at trial, as the basis to establish a history of criminal behavior as an enhancement factor. The testimony was given by the defendant's ex-wife, who related three incidents of violent behavior on behalf of the defendant toward her. These included holding her and other people at gunpoint and threats to kill her and bury her alive.

The trial court characterized the ex-wife's testimony as "propensity evidence" and declared it inadmissible in the case in chief. At sentencing, the trial court viewed the ex-wife's testimony concerning the kidnappings to be "clear and convincing and beyond a reasonable doubt" and utilized it to establish the defendant's past criminal behavior. Criminal behavior need only be shown by a preponderance of the evidence to enhance a sentence. State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998).

The defendant would have us exclude this evidence because it was introduced at a pretrial hearing, thus not conforming to the defendant's interpretation of Tennessee Code Annotated section 40-35-210(b)(1). The statute provides that the court, in determining the appropriate sentence, will consider the evidence received at the trial and the sentencing hearing. Our interpretation is broader and construes "trial" as including pretrial hearings. The Sentencing Commission Comments state that subsection (b) is intended to permit the court "the greatest latitude in considering all available information in imposing the appropriate sentence and sentence alternative." We therefore conclude that the establishment of the defendant's criminal behavior by a preponderance of the evidence at the pretrial hearing was appropriate.

The defendant also alleges that the use of the enhancement factor, abuse of a private trust, was in error. The defendant bases this contention on the authority of State v. Gutierrez, 5 S.W.3d

-14-

641 (Tenn. 1999). Therein, our supreme court analyzed the applicability of the private trust factor in the context of two cohabitating, competent adults.

We are instructed in Gutierrez to examine the nature of the relationship and whether that relationship promoted "confidence, reliability or faith," thus causing the victim to be "particularly vulnerable." Once the private trust is proven, the State must then show that the defendant abused that relationship in committing the crime. Id. at 646.

The record in this case reveals a marriage in its terminal stages. The evidence indicates that the victim was profoundly discontented with her marital situation and was happily anticipating an imminent separation and an ultimate divorce. In short, the evidence portrays the antithesis of a relationship based on confidence, reliability, or faith. We conclude that under these circumstances, application of the enhancement factor for abuse of a private trust was inappropriate.

By elimination of abuse of private trust, there is left only one enhancement factor, that the defendant had a past history of criminal behavior. However, the trial judge stated that the criminal behavior "weighs very heavily as an enhancement factor." It is apparent that the trial judge gave little weight to the mitigating factor in that he described the attributes justifying the mitigation as "pretty well expected of any individual citizen of the United States[.]"

The wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000). This determination requires that we review the evidence supporting any remaining enhancement factors, as well as the evidence supporting any mitigating factors. State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002).

Having reviewed the evidence supporting both the remaining enhancement factor and the mitigating factor, we affirm the sentence as imposed.

The last issue posed by the defendant is that the cumulative errors denied the defendant a fair trial. Our review of the record as a whole does not lead us to that conclusion, and we deem the issue to be without merit.

After careful review, we conclude that the evidence was sufficient to support the conviction, and having found no reversible error, we affirm the conviction and the sentence.

_____
JOHN EVERETT WILLIAMS, JUDGE